Oh yay, oh yay, oh yay! The Honorable Appellate Court, 5th District, State of Illinois, is now in session. The Honorable Justice Bowie presiding, with Justice Barberas and Justice Vaughn. The first case this morning is 524-0782, People v. Weaver. Arguing for the appellant is Sarah Curry. Arguing for the appellee is Gary Ganetovic. Each side will have 10 minutes for their argument. The appellant will also have 5 minutes for rebuttal. Please note, only the Clerk of the Court is permitted to record these proceedings today. Good morning, Counsel. How are you today? Good, good morning. Before we get started today, I do, although you cannot see him, I would like to recognize our newest member of our Court, Justice R.C. Bollinger, who is from Macon County and watching the proceedings today. So we want to welcome him today and also to the Court. So with that being said, Ms. Curry, are you ready to proceed? I am. Then go right ahead. Good morning, Your Honors. I'm Sarah Curry from the Office of the State Appellate Defender, and I represent Edward Weaver. I'd like to focus my argument this morning on the compulsory joinder issue and the other crimes evidence issue, but I'm happy to take questions on any of the issues raised in the briefs. The purpose behind the compulsory joinder rule is to prevent the state from ambushing a defendant with additional and oftentimes more serious charges at the last minute, even though it could have brought those charges at the same time as the original charges, because this leaves the defendant with an unacceptable choice between enforcing his speedy trial rights and giving them up in his need to prepare for trial on the new charges. Here, the state charged Weaver with aggravated battery with a firearm, aggravated possession of stolen firearms, and unlawful use of a weapon by a felon on August 17th, 2020, almost 200 days later and just 26 days before trial. On March 3rd, 2021, the state filed its second amended information, adding a charge of attempt murder and four charges of aggravated discharge of a firearm. These new charges were brought a week after and arguably in response to Weaver rejecting a negotiated plea offer. The state does not dispute that the new charges were known to the prosecutor at the time of the original charges or that the charges were within the jurisdiction of a single court or that the charges were based on the same act. The state argues that the attempt murder and aggravated discharge of a firearm charges were not new and additional because the original charges gave Weaver adequate notice to prepare his defense. Here, this court's decision in Sanlin is directly on point. As in Sanlin, the new attempt murder charge alleged an offense with a much greater possible sentencing range and required proof of different elements, namely performing an act which constituted a substantial step toward the killing of an individual with the intent to kill that individual. As in Sanlin, the subsequent charges were new and additional for compulsory joinder purposes. Also, as in Sanlin, there was no strategic reason for defense counsel not to move to dismiss the subsequently filed attempt murder and aggravated discharge of a firearm charges. Counsel's inaction resulted in Weaver asking for attempt murder. And as such, Weaver was prejudiced by counsel's deficient performance. The state argues that the Illinois Supreme Court's order in response to the COVID-19 pandemic allowing circuit courts to continue trials until further order of the court defeats Weaver's compulsory joinder argument. The Supreme Court order stated that any delay resulting from the emergency continuance order shall not be attributed to either the state or defendant for purposes of the speedy trial statute. The order does not mention the compulsory joinder statute. Here, the state's delay in bringing the new charges was not a result of the emergency continuance order. Compulsory joinder is all about what the state knew and when. The state knew about the new charges at the time the original charges were brought and at all times after that. The purpose of the emergency order was to safeguard the public and prevent the spread of COVID. But the delay in bringing the new charges was not a result of this stated purpose. And so the order should not apply. During this period, discovery continued, negotiations were happening, and Weaver was preparing his defense. The case did not come to a halt simply because the trials were continued based on COVID. Moreover, the new charges were not, quote, before the court, end quote, when COVID delays occurred. And therefore, those delays do not apply to the subsequent charges. Weaver asked this court to reverse his convictions for attempt murder and aggravated discharge of a firearm and remand for resentencing on the remaining charges. Prior to trial, I'm going to move on to the other crimes evidence issue. Prior to trial, the state sought to introduce evidence that stolen firearms were recovered from the trunk of Weaver's car as other crimes evidence. It was undisputed that none of these firearms recovered from his car were the firearm used in the shooting of Fereece Campbell. The state argued that the evidence was not being introduced for propensity, whether it was relevant to show identity, absence of mistake, the reliability of the confidential informant, and that the offenses were intertwined. The court granted the state's motion finding the evidence was relevant to identity, presence, and because the offenses were intertwined. However, none of these bases for admission were applicable. Moreover, the manner in which the state introduced the evidence of the stolen firearms at trial establishes that the state was not actually seeking to use the evidence for non-propensity purposes. The state introduced the video of Weaver's interrogation where he was asked over and over again over the course of an hour about the stolen firearms. And then in direct response to Detective Etherton's testimony that Weaver told them that firearms were not his M.O., the state introduced the photos of the stolen firearms in Weaver's trunk. It was a mic drop moment, letting the jury know that, in fact, firearms were Weaver's M.O. This was propensity evidence. On appeal, the state seems to have abandoned all of its bases for admission that it argued below, consistent with the manner in which it presented the evidence at trial. The state now argues that the evidence of the stolen firearms was probative on the issue of proving Weaver as the shooter. According to the state, weapons are generally admissible when there is proof that they are sufficiently connected to the crime and the defendant. However, here it is undisputed that none of the stolen weapons recovered from the trunk was the weapon used in the shooting of Campbell. There was no way to connect the weapons to the offense. The state also argues that by introducing the stolen firearms, the jury was left not to speculate that Weaver would possess such weapons capable of shooting at a long distance. This is propensity evidence 101. As such, the state's argument fails. The error in admitting this evidence was not harmless. This offense involved a shooting from a long gun based on the distance between the shooter and Campbell. The stolen firearms recovered from the trunk were all shotguns and rifles. While the jury was told none of the stolen firearms was the one used in the shooting of Campbell, the implication is clear that these are the types of firearms that Weaver used. Moreover, the jury struggled with the intent to kill as it related to attempt murder. They sent out a note asking for the definition of intent to kill, and they deliberated for almost five hours. Evidence that Weaver was in possession of a bag of 11 stolen firearms could have implicated the jury's discussions about whether Weaver was the type of person who would have had the specific intent to kill. If the jury had a reasonable doubt as to whether Weaver had the intent to kill, they may have resolved that question in favor of conviction because Weaver was a bad person deserving of punishment. Weaver asked his court to reverse his convictions for attempt murder, aggravate a battery with a firearm, and aggravate a discharge of a firearm, and remand for a new trial. Thank you. I understood you at the beginning when you completed your argument about the joinder and the speedy trial. You said those counts should be dismissed while in the speedy trial, and this should be remanded for sentence on the remaining charges. But you're not really asking remand and sentence on the remaining charges. You think the other charges should be dismissed also because of the firearm evidence? Well, that would be remanded for a new trial. If you vacate the attempt murder on speedy trial grounds, then you still have the aggravated discharge of a firearm that we would ask should be reversed and remanded for a new trial based on the other crimes evidence. All right. Thank you. I think Ms. Curry froze up a little bit, but I think she got your answer correct. I think so. Okay. Justice Barberis, do you have any questions? No. All right. And obviously, Ms. Curry, you're going to have your chance for your rebuttal. Thank you. Counsel, go right ahead. Good morning, Your Honors. May it please the court. Counsel, my name is Gary Genetovic. I am with the State's Attorney's Appellate Prosecutor's Office. With respect to the speedy trial compulsory joinder issue that's been raised by the defendant, the state really has two components to our argument. In this case, the original charge was filed on 8-14 of 2020, aggravated battery, aggravated possession of a stolen firearm and a new UW by a felon. On March 3rd of 2021, the Second Amendment information was filed. And, yes, if you take the 120 days and you just do the math, obviously, the 120 days from August 14th expires on 12-12 of 2020. The problem is, is that before these charges were even filed, the Illinois Supreme Court came out with a series of administrative orders that basically, for lack of a better way to put it, I guess, suspended the speedy trial statute. Suspended its application, basically, because of COVID. And so, what the genesis of our argument here is the fact that if speedy trial was not applicable, was not viable at the time, then to take and apply it even to compulsory joinder doesn't really fulfill the purpose of the speedy trial. Doesn't fulfill the purpose of compulsory joinder. Doesn't fill the purpose of what this was all about at the time. I mean, COVID was what COVID was, okay? It was extremely bad and everything, a lot of things changed and a lot of things were suspended. And so, in applying this, we have to take into account the Williams rule, okay? And the Williams rule, and counsel kind of referenced this, talked about continuances during the pandemic and all this. Generally, continuances that are obtained originally on final charges cannot be applied to subsequent charges that are filed because they weren't before the court. Well, I guess the logical question to me is, if there's no speedy trial going on at that time, then how can we apply speedy trial for anything? And in addition to that, Williams really is more of a, what we want to take and do is we want to take and prevent a trial by ambush. So, we have a combination of things. If we end up, if the state ends up filing, for example, in Sandlin. In Sandlin, I'll get to the dates here. The offense occurred on 5-16 of 17. The original charge is 5-24 of 17. On 11-6 of 17, the state filed its amended charge related to the May 16, 17. That ended up being one week before the trial because the two-day trial started on November the 13th of 17. Now, that is your classic case of if you want to call a trial by ambush because what you've now done is you've now created a Hobson's choice for the defendant. Do I take and try to get a continuance now to be able to prepare? Or do I take and go to trial, if you will, unprepared? Or do I have to sit in jail? What's my choice, okay? Basically, the rock and the hard place, as they say. But that's not the situation here. Here we have the suspension of the speedy trial. We have the filing of this, of the amended information that brought the attempted murder charge and aggravated discharge offenses on March 3rd. We do not have a trial in this case for two and a half years. This is not a trial by ambush by any stretch of the imagination. And on top of that, what we have is we have, obviously, we have more than enough time for the defendant to prepare. But if we go back to the standard where we have to say, look, does the original charging instrument give him adequate notice? It did. The original charge of aggravated battery with a firearm charged him with shooting the victim, causing great bodily harm to the victim through the use of a firearm. The attempt murder is exactly the same thing. Yes, indeed, the additional element is an intent to kill. I would think it would be a much more clearer example of a case that would be new and additional. For example, if the state had not originally charged aggravated possession of the stolen firearms. If they had added that on March 3rd, that would be a much more difficult situation for the state to present because that is an entirely different crime, different elements, different everything. And so when we analyze this, the state does not believe that the purpose and spirit of the speedy trial compulsory joinder is actually put into play here or benefited, if you will, by application in this particular case, given the fact that the additional charges are not new and additional. The defendant had more than enough information, adequate notice of the charges, and had more than adequate time to prepare his defense and present his defense, which his defense was, even as counsel even pointed out in her argument, is the fact that they didn't prove it was me that did it. And so under the circumstances of this case, I think that application here, if you will, technical application of this does not forward the purpose and spirit of compulsory joinder and the case law defining that. Let me ask you a question. Let me ask a question if you don't mind. The defendant points to our decision in 2021 case people be Sandlin. And unless you can point me to it, where you address that case in your brief. My, my reading of your guys brief was that you didn't address it at all. You didn't make any points with regard to it. And, you know, the defendant points out that it's directly on point to this case in regard to compulsory joinder. I just like you to address that. Why why Sandlin wasn't addressed in the state's brief. I didn't take in and address Sandlin because of the fact that the heart of our argument here was was the fact of covert is the fact that all of that tends to does distinguish the Sandlin case in the sense that. Suspended speedy trial, you were talking about speedy trial, compulsory joinder as well as the fact of trial by ambush. And as I pointed out, Sandlin clearly wasn't a case where you had a trial by ambush.  I don't think that. The new and additional aspect of Sandlin. Was correct, but because I think that if you look at the charges here, the way they were framed the way they were. Filed, I think, adequately, I think, establishes that that the attempt murder charge is not new and additional as that is defined in Williams and is that as the final with the courts of health. And so I think that that the heart of my argument really was directed more toward trying to establish the necessary aspects of the case that would support our argument that would support the fact that the. There was not a. Speedy trial violation in this particular case. And I understand that and I can appreciate that part of your argument with regard to coven and the administrative orders that were in place at the time. My only concern or my questions. First of all, I know Sandlin pretty well I authored it. And Justice Vaughn was a panel member on on that case as well. The, the, the facts of that case are very similar in regard to firing in the direction of someone in a vehicle. Right. Percussions knowing the repercussions of that act. And so I was just curious why the state didn't at least briefly. I suppose there really is anything to distinguish it other than cope. Well, well, that would be that was obviously was the 1st line that that I took and again, I think that. I guess sometimes what I do is I feel as though that the coven and the argument that we made concerning new and additional adequately just tries to set our case apart from Sandlin to the point where to take and go through and try to take and distinguish it. I simply end up bearing repeating myself. And so, and so what I did is that's that's right or wrong. Good or bad. Basically, that's my, my, my appellate philosophy when I write my briefs and things like that. But I try to take and present the state's case as strongly as I can. And, and I think a lot of times I, I, I view it as though that that ends up distinguishing a lot of what the defendant has argued as well as the case they have without taking up a whole lot of time and extra verbiage. That don't really do anything more than I said. Sure. And I, and I would have probably not been asking these questions had in the, in your guys brief, you would have said something just a 1 line sentence. I was wondering if you just overlooked it, or if it was so damaging to the state's case that you just avoided it. And I didn't think you would do it for that purpose. No, no, definitely. Definitely not. I probably put too much probably put too much stock in my own argument as opposed to putting the 1 line. And so I apologize. I'm not saying that that's the case. I just wanted to clarify that wasn't even mentioned in your brief. Okay, I appreciate that. I know we're out of time, but given some of the questions, I didn't know if justice Vaughn or just as barbarous had any questions, maybe of counsel regarding that other crimes evidence. Issue, I don't have any specific questions and I know the, the brief addresses it, but if if you as are presiding today would would allow counsel to very briefly just address that issue. I think it'd be helpful for me. Just as long as I'm okay with you. Yes. Okay. So, if you could, in a couple minutes, try to I'll do the best I can. In this case, with the admission of the stolen firearms. Weapons. This was proof. If there's officially connected the crime. And what we have is we have when you, when you have testimony showing that a weapon was used when you have subsequent evidence that the defendant participated in the crime. And if you didn't have a weapon admitted that was similar to the one that was using the crime, it is admissible to connect. And in this case, that's exactly what we have.  So, the evidence is used. And I think this even kind of sort of came out in counsel's own argument here that the evidence is used, you know, to establish the identity to establish the defendant was the shooter. And that is, is, is, is established through the fact that he possessed this massive amount of guns, long shotguns, rifles, etc. It would have been similar to a long gun, which I'm not by any stretch of the imagination and expert on weapons, but I would assume is something similar to a rifle in some nature. And so, in this case, the admission of this was relevant to help circumstantially establish the identity of defendant as the shooter. Now, in this particular case, we've also argued harmless error. And in this case, the question is, with harmless error, is there's no reasonable probability that the jury would have acquitted defendant absent the error. What defendant argues is, defendant argues, well, the jury considered this. So, since the jury considered this, there's no fact that it can't be harmless. Well, if that's the case, then basically, let's just eviscerate the harmless error argument, because every time an error is stated, and it's part of something that goes back to the jury, they're going to have, obviously, the presumption is they're going to have considered it. That's not how you do this. What you have to do is you have to look at the balance of the evidence, and you have to take and, if you will, extract the error and say, okay, with all this evidence that we have, all this evidence that was deduced, if this is all the jury had, without this error, would the jury still have convicted? And if you can take and say they still would have convicted, then that error is harmless. And so, under the facts of this case, we believe that the error is harmless if there is, in fact, error at all. That's basically my two minutes. Thank you, counsel. You're welcome. Justice Barberis, was that sufficient to help you? It was, and I appreciate it. Thank you. Thank you. Before we move on, any other questions for counsel, Justice Vaughn or Justice Barberis? No. I didn't really touch on it either side, and maybe Ms. Currie can touch on it in a rebuttal, but the text messages between the defendant and Carriker, how were those disclosed? Were they as a result of the search warrant of the Facebook account, or how were those? What are you talking about? The text messages were part of the search warrant, and they were obtained as part of the search warrant in this case. And we've argued that there was probable cause to establish that simply from the nature of the investigation, the connection of the defendant to the crime, everything that they had at that point. And they knew that there was messages between the victim and Carriker, and so they knew the connection of the character and the defendant, so they made the necessary connection to take and obtain probable cause to get a search warrant. We've also argued on this issue inevitable discovery as well as good faith. And inevitable discovery in this case, I think, would most definitely have occurred because the police would have been able to have obtained the text messages and the information from Carriker on her phone. If the defendant sent her information on her phone, her phone's got it. So now they're going to be able to make a connection between everything between her and him and the conversations that went on. Now, I know a defendant has argued that basically inevitable discovery has been waived here, but if you look at the two cases that they cite in their reply brief, both of those, the state was the appellant. And the rule is, as an appellant, you can't raise a new issue, a new argument on appeal. As an appellee, we can argue whatever the record takes and can sustain because we're sustaining the judgment. And so we are obviously able to present the inevitable discovery doctrine as well. And just a side note, we've also argued harmless error and that was well based on the facts of the case, etc. So, thank you. You're welcome. Just barbarous? No. Okay. Thank you. So, Miss Curry, you want to go ahead with your rebuttal? Yes, thank you. Miss Curry, if I could stop you before you start, I just want to clarify something. In your brief, and what triggered me to even bring this up was the state's counsel's statement of he's not a gun expert. On page 11 of your brief, you mentioned the gun that was allegedly used. I don't know if this was a, I don't think it was a quote, but Etherton testified that the investigation revealed that the weapon used to shoot Campbell was a .233 caliber or higher. I'm assuming that was a typo and it was a .223. I'm going to take your word for that. I'm not positive. It might have been a typo. Yes. Okay, this is barbarous. That's not fair. You know, that's a typo. Sorry, I am not a gun expert at all. Okay. All right. Just wanted to clarify if there was a caliber out there that I was unaware of. No, I apologize. We're cutting into your time and I'll let you, you have to understand Miss Curry that both Justice Barbarous and I are fairly avid gun folks. So we do know the calibers. Okay, I apologize. It's the little things. It's like when the state charges somebody and says, well, they found a clip with five live rounds. Well, there's no such thing as a clip with five. It's a magazine with five live runs. A clip is something completely different. But anyway, I'm glad you won't be losing any of your time because of my question. Thank you. I just want to go back to the COVID aspect of the compulsory joinder issue. And, you know, the state argues that there was no ambush here because the trial time was tolling. However, it's important to realize that while the trial period was tolling, there were things going on. Mr. Weaver was preparing his defense to the charges filed in the initial information, and he rejected a plea offer that came before the attempt murder charges were filed. So it wasn't just as if nothing was happening. He was making very important decisions. Your point, I'm assuming, is that it was retribution that the state, because he didn't accept the offer that was made. But my reading of the briefs and my understanding of the argument wasn't that the compulsory joinder and the trial by ambush was related to the time of the new charge. But doesn't the state try and say or suggest that because of the nature of the original charge and the first amendment complaint, that the defendant should be aware of the fact that those factual occurrences could have put him on notice or should have put him on notice that certainly attempted murder could be one of the things that could come from that set of facts. And that was similar, I guess, in the Sandlin case, that there were shots fired in the direction of a vehicle that knew or should have known someone was in it. At least in Sandlin, the vehicle was moving, the tractor was moving. So it wasn't by robot or wire. And there should have been some knowledge that if you shoot towards someone in a vehicle or walking down the street, it could result in that person's death. And so we could charge you with murder. How is it that this defendant would have been surprised by the charge of attempted murder, given those facts? Well, as this court found in Sandlin, the attempt murder charge is a surprising additional charge in that now he was facing natural life in prison as opposed to just a regular classic sentencing scheme. And the additional element of the intent to kill is not you're not put on notice of that from an aggravated discharge of a firearm charge. It's simply a much greater, more specific element that he now has to defend against. And the state points out the two and a half years that then transpired before he went to trial. Well, yeah, now he's all of a sudden charged with attempt murder and he has to decide, you know, I've got to take a step back and prepare a defense on this much more serious charge that I'm now facing natural life in prison for. It certainly was a bigger deal at that point. You know, and then and the new charges, again, going back to the ambush, came 26 days before trial before the case was set for trial. And Weaver had all along been wanting to go to trial as soon as possible. And here, 26 days before the trial date, these new charges are filed. So I would argue it certainly is a trial by ambush at that point when the state doesn't dispute that these the facts, all the relevant facts were known to the prosecutor at the time of the original charges. And these charges certainly could have been brought along with the original charges. Just to touch quickly on the question about the Facebook messages, you know, we do argue that there was no probable cause. Etherton's statement in the complaint was kind of casting a wide net that basically whenever somebody might be a suspect of a crime, we can check everything on their phone, everything on their social media. It's just too wide of a net, too much of a fishing expedition. And as for the inevitable discovery, if it would have been found through Carrikers, well, it's kind of speculation because that presupposes that there was no Fourth Amendment violation in the warrant for her Facebook messages. And we just don't know. It's speculative at this point to make that argument. If there are no other questions. Justice Vaughn or Justice Barbera, do you have any final questions? I don't have any questions. I just want to clarify that I'm also a gun aficionado, not to the extent of Barbera and who we are, but. I may be the only one that's not, but. No, and I don't have any further questions. Thank you. And I did love that. Thank you. Well, obviously, we'll take the matter under advisement. We'll issue an order in due course and thank you for your arguments and hope you have a great day. Thank you. Council. Thank you.